## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PENNY LEE WOOD, | ) | CASE NO. 1:14-CV-00998 |
| | ) | |
| Plaintiff, | ) | JUDGE GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Penny Lee Wood ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423. This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this Report and Recommendation.

## I.    PROCEDURAL HISTORY

On April 8, 2011, Plaintiff filed her application for POD and DIB, alleging a disability onset date of September 9, 2010. (Transcript ("Tr.") 38.) Plaintiff's claim was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On July 11, 2012, an ALJ held Plaintiff's hearing. (*Id.*) Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id.*) A

vocational expert ("VE") also participated and testified.  (*Id.*)  On September 21, 2012, the ALJ found Plaintiff not disabled.  (Tr. 35.)  On March 4, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On May 8, 2014, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this matter.  (Doc. Nos. 18, 20, 21.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in failing to consider Plaintiff's documented condition of ulcerative colitis/diarrhea; (2) the ALJ erred in failing to consider the VE's testimony regarding time spent off-task; (3) the ALJ erred in evaluating the opinion of Plaintiff's treating physician, Dr. Petrulis; and (4) the ALJ erred in failing to acknowledge a third party statement from Plaintiff's former supervisor.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in May 1965 and was 45-years-old on the disability onset date. (Tr. 43.)  She had at least a high school education and was able to communicate in English.  (*Id.*)  She had past relevant work as a group home supervisor, psychiatric aide, and accounts payable clerk.  (*Id.*)

### B.  Medical Evidence[1]

#### 1.  Medical Reports

---

[1]  The ALJ found that Plaintiff had the following severe impairments: neck and back pain; obesity; decreased vision; and depression.  (Tr. 40.)  Plaintiff's challenges to the ALJ's decision concern only her physical impairments.  Accordingly, the Court will limit its summary of Plaintiff's medical records to evidence of her physical impairments.

2

In December 2007, Plaintiff treated with pain management specialist Xiaoyuan Xie, M.D., for ongoing neck and arm pain, which reportedly began after Plaintiff underwent spinal surgery about there years prior.  (Tr. 374, 472.)  Plaintiff described her pain as "manageable" with medication and osteopathic manipulation.  (Tr. 374.)

In March 2008, Plaintiff saw her primary care physician, Angelo Babbo, D.O., with complaints of left-sided back pain.  (Tr. 347.)  On examination, Dr. Babbo found no spinal or muscular abnormalities.  (Tr. 347-349.)

Plaintiff returned to Dr. Babbo in April 2008 with complaints of worsening neck and back pain.  (Tr. 344.)  On examination, Plaintiff had decreased range of motion and tenderness in her neck.  (Tr. 345.)  Dr. Babbo referred Plaintiff to Dr. Xie, and in May 2008, Dr. Xie administered an injection.  (Tr. 372-373.) Dr. Xie's postoperative diagnosis was chronic neck pain, right neck pain, and right cervicogenic headache; cervical degenerative disk disease, degenerative joint disease, and facet arthropathy; and status post cervical anterior C4-CS fusion and failed back syndrome.  (Tr. 372.)

In September 2008, Plaintiff treated with Dr. Babbo for back pain and frequent urination.  (Tr. 341.)  Dr. Babbo's only abnormal finding on examination was abdominal tenderness.  (Tr. 342.)

At Plaintiff's January 2009 examination with Dr. Babbo, she denied spinal symptoms and had a normal examination.  (Tr. 338-340.)

In November 2009, Plaintiff returned to Dr. Babbo twice, but the only abnormality found on physical examination was diffuse abdominal tenderness.  (Tr. 332-337.)  Plaintiff also had MRIs of her neck and lower back, which revealed anterior spinal fusion with metallic artifacts at C3, C4, and C5; mild cervical spondylosis diffusely; mild to moderate

3

foraminal stenosis at C4-C5 due to hypertrophia change; diffuse lumbosacral spondylosis with disc degeneration; and scattered tiny Schmorl's nodes. (Tr. 363-366.)

On November 3, 2009, Plaintiff complained to Dr. Babbo of intermittent but daily diarrhea. (Tr. 335.)

In April 2010, Dr. Babbo referred Plaintiff to a gastroenterological (GI) specialist after she complained of digestive issues and abdominal tenderness. (Tr. 331.)

In May 2011, Plaintiff treated with a new primary care physician, Alica Petrulis, M.D. (Tr. 472.) Plaintiff complained of chronic neck and back pain; anxiety; poor memory; depression; and diarrhea. (Tr. 472.) Plaintiff reported to Dr. Petrulis that she had not had a solid bowel movement since her back surgery. (*Id.*) Dr. Petrulis' diagnoses included chronic pain following surgery or procedure; depression; anxiety; ulcerative colitis; and dysphagia. (Tr. 474.)

In June 2011, Plaintiff treated with GI specialist Amy Soloman, D.O. (Tr. 454.) Plaintiff reported 6 to 10 watery bowel movements per day since her spinal fusion surgery. (*Id.*) Plaintiff's physical examination was normal. (Tr. 456-457.) Dr. Soloman's diagnosis included ulcerative colitis; bloating; abdominal cramping; and loose stools. (Tr. 456.)

In August 2011, Plaintiff treated with GI specialist Syed O. Hasan, M.D. (Tr. 436-440.) Dr. Hasan noted that Plaintiff was a "female with chronic diarrhea and reported history of [ulcerative colitis] although presentation does not sound convincing for [ulcerative colitis]." (Tr. 440.) Dr. Hasan suspected that Plaintiff's symptoms might be related to irritable bowel syndrome (IBS) or her prior surgery. (*Id.*)

Plaintiff treated with pain management specialist David A. Ryan, M.D., in November 2011. (Tr. 419-422.) On examination, Plaintiff's neck was tender, and Dr. Ryan noted that

4

the right side of Plaintiff's face drooped. (Tr. 419.) Dr. Ryan diagnosed ulcerative colitis, Horner's syndrome,[2] headache, and cervico-occipital neuralgia. (Tr. 421.)

Plaintiff continued pain management treatment in January 2012 with nurse practitioner Krista L. Mousted, who noted muscle spasms in Plaintiff's shoulders on examination. (Tr. 534-536.) Plaintiff reported some relief from her TENS unit. (*Id.*) That same month, Plaintiff was examined by rheumatology specialist Zohair Abbas, M.D., who did not believe that Plaintiff's neck pain and tingling in her hands and feet was caused by a systemic connective tissue disorder. (Tr. 552.) Plaintiff had restricted range of motion on her left shoulder. (*Id.*) Dr. Abbas administered an injection in Plaintiff's shoulder for her pain. (*Id.*)

In January 2012, Plaintiff followed up with Dr. Hasan about her complaints of persistent diarrhea. (Tr. 558.) Plaintiff reported little improvement with fiber and medications. (*Id.*) Dr. Hasan noted that Plaintiff's symptoms were most consistent with IBS and gastroesophageal reflux disease (GERD) but that he could not exclude the possibility of microscopic colitis or malabsorption. (Tr. 562.)

In February 2012, Plaintiff treated with Nurse Ann Zudic from Dr. Ryan's office, who noted that Plaintiff had pain in the neck with range of motion exercises and that Plaintiff was not entirely mentally clear. (Tr. 580-582.) Nurse Zudic suggested that Plaintiff decrease the dosage of her pain medications. (Tr. 582.)

In April 2012, Plaintiff went to the emergency room with complaints of pain in both of

---

[2]     Horner's syndrome is a condition that affects the nerves to the eye and face, typically resulting in a decreased pupil size, a drooping eyelid, and decreased sweating on the affected side of the face.

her wrists and neck.  (Tr. 638-645.)  After an examination and wrist x-rays revealed no

significant abnormalities, doctors discharged Plaintiff in stable condition without

admission.  (Tr. 638-645, 660.)

### 2. Opinion Evidence

On July 28, 2011, Dorothy A. Bradford, M.D., opined that Plaintiff had activity

restrictions including "bending, climbing, driving, operating equipment, operating

machinery, pulling, pushing, reaching, squatting."  (Tr. 411.)

In August 2011, state agency reviewing physician Lynne Torello, M.D., opined that

Plaintiff could perform light work, but could use her right arm to push and pull overhead

controls and reach overhead only occasionally; could never climb ropes, ladders, or

scaffolds; and could occasionally crawl.  (Tr. 101-104.)  Dr. Torello opined that Plaintiff had

a limited right field of vision but was able to avoid ordinary hazards.  (Tr. 103.)  She further

opined that Plaintiff should avoid all exposure to hazards including commercial driving,

unprotected heights, and dangerous machinery.  (*Id.*)  In November 2011, state agency

reviewing physician Bradley J. Lewis, M.D., also opined that Plaintiff could perform light

work with additional postural, manipulative, and visual restrictions.  (Tr. 117-119.)

In October 2011, Dr. Petrulis opined that Plaintiff could walk, stand, or sit for a total

of no more than four hours per day, and for no more than one hour at a time.  (Tr. 543-

544.)  Dr. Petrulis further opined that Plaintiff could lift no more than five pounds frequently

or occasionally and that she was "extremely limited" in her ability to push, pull, bend,

reach, handle, or perform repetitive foot movements.  (*Id.*)  Dr. Petrulis found that Plaintiff's

ability to see was markedly limited; her ability to hear was moderately limited; she would

be unable to change positions due to discomfort; and she was severely limited in her

6

ability to hold heavy objects.  (*Id.*)

**C.     Hearing Testimony**

> **1.     Plaintiff's Hearing Testimony**

Plaintiff last worked as a group home supervisor.  (Tr. 63.)  She stated that she had to stop working because she needed to move to Ohio to take care of her father, and because she could no longer perform the job.  (*Id.*)  Plaintiff testified that she had trouble remembering what she needed to do at work, and she was no longer able to be hands on with her clients.  (Tr. 66.)  She had trouble lifting and carrying things and sitting and standing.  (Tr. 67.)  Plaintiff testified that she had disc replacement surgery several years ago and that she "came out of the surgery wrong; not whole."  (*Id.*)  She stated that she had loss of vision, headaches, wrist pain, and chronic pain from the base of her neck, down her back, and across her shoulders to the middle of her arms.  (Tr. 68, 74.)  Plaintiff took several medications for her symptoms, which caused such side effects as dry mouth, fatigue, sleepiness, irritation, and anger.  (Tr. 73.)

Plaintiff further testified that she suffered from ulcerative colitis.  (Tr. 78.)  She stated that because of her condition, she did not eat.  (*Id.*)  She stated that she had not had a firm bowel movement since her surgery.  (Tr. 79.)

> **2.     Vocational Expert's Hearing Testimony**

Nancy Borgeson, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who would perform a limited range of sedentary work and would require a sit/stand option every hour.  (Tr. 89.)  The individual could perform simple and more complex tasks in and environment with routine changes.  (Tr. 87.)  She would be off task

5% of the workday and would be precluded from fast-paced work.  (*Id.*)  She would be limited to occasional contact with the general public, co-workers, and supervisors.  (*Id.*)  She would be precluded from climbing ladders, ropes, and scaffolds; could occasionally climb ramps and stairs; could not work in unprotected heights or near dangerous machinery; could occasionally perform left and right overhead reaching; could occasionally push and pull overhead controls with the right upper extremity; could occasionally balance, stoop, kneel, crouch, and crawl; and could frequently handle bilaterally.  (*Id.*)  Furthermore, the individual would have limited field of vision in the right eye.  (*Id.*)  The VE testified that the hypothetical individual could perform work as a credit card clerk; a referral information clerk, and a lost charge card clerk.  (Tr. 88-89.)

The VE further testified that the hypothetical individual would not be able to sustain any job full time if she would be off task 20 percent of the workday.  (Tr. 89.)  Plaintiff's attorney asked the VE whether Plaintiff, who would require 8-10 bathroom breaks per day, would be capable of performing any jobs.  (Tr. 90.)  The VE stated: "Well that could require a special accommodation.  It's difficult to say.  In an office setting, it's possible she could get away with it if she were close to the restroom, but as jobs are ordinarily performed they don't permit that many restroom breaks."  (*Id.*)  The VE further stated that it would be difficult to place a person with such a limitation in a job.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically

8

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  Abbot, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

9

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.    The claimant has not engaged in substantial gainful activity since September 9, 2010, the alleged onset date.

3.    The claimant has the following severe impairments: neck and back pain; obesity; decreased vision; and depression.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she requires a sit/stand option every hour; she is limited to simple and more complex tasks in an environment with routine work changes; she would be off task 5% of the work day; she is precluded from fast paced work; she is limited to occasional contact with the general public, co-workers, and supervisors; she is precluded from climbing ladders, ropes, and scaffolds; she can occasionally climb ramps and stairs; she cannot work in unprotected heights or near dangerous machinery; she can occasionally perform left and right overhead reaching; she can occasionally push and pull overhead controls with the right upper extremity; she can occasionally balance, stoop, kneel, crouch, and crawl; she can frequently handle, bilaterally; and she has limited field of vision in the right eye.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born in May 1965 and was 45-years-old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.    The claimant has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 9, 2010, through the date of this decision.

(Tr. 40-44.)

## LAW & ANALYSIS

### A.     Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

11

**B.**     **Plaintiff's Assignments of Error**

    **1. The ALJ Erred in Failing to Consider Plaintiff's Documented Condition of Ulcerative Colitis/Diarrhea**.

    **and**

    **2. The ALJ Erred in Failing to Consider the VE's Testimony Regarding Time Spent Off-task.**

As Plaintiff's first and second assignments of error are related, the Court will address them together.

Plaintiff takes issue with the ALJ's failure to consider her documented condition of ulcerative colitis/diarrhea.  According to Plaintiff, the ALJ should have found that Plaintiff's ulcerative colitis/diarrhea constituted a severe impairment.  Plaintiff further argues that her diagnosis of ulcerative colitis and her reports of 8 to 10 episodes of diarrhea per day are particularly relevant to her disability claim in light of the VE's testimony that an employee who requires "eight to ten additional bathroom breaks, with whatever time that would require" would need a special accommodation from an employer.  (Tr. 90.)  The Commissioner responds that the ALJ did not err, because the ALJ's failure to find ulcerative colitis to be a severe impairment is, at most, harmless error, and because Plaintiff failed to demonstrate that she required additional limitations beyond those included in the ALJ's residual functional capacity (RFC) determination.  For the following reasons, Plaintiff's argument has merit.

As a preliminary matter, the Commissioner is correct in asserting that even if the ALJ erred in concluding, at step two of his analysis, that Plaintiff's ulcerative colitis/diarrhea was non-severe, that error is likely harmless.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination

process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").

Here, although the ALJ concluded that Plaintiff's ulcerative colitis/diarrhea was non-severe, he found that her neck and back pain, obesity, decreased vision, and depression were severe impairments.  Accordingly, Plaintiff cleared step two of the analysis.  *See Anthony*, 266 F. App'x at 457.  An ALJ must consider all of a claimant's impairments, severe and not severe, at every subsequent step of the sequential evaluation process, however.  *See* 20 C.F.R. § 404.1545(e).  In discussing the medical evidence of record in determining Plaintiff's RFC, the ALJ makes no mention whatsoever of Plaintiff's documented reports of frequent diarrhea and her diagnosis of ulcerative colitis.  Indeed, the ALJ's discussion of the medical evidence of record is unreasonably brief and particularly unhelpful to the reviewing Court, as he summarizes hundreds of records relating to Plaintiff's physical condition in one paragraph with no discussion of the records relating to ulcerative colitis/diarrhea.  As discussed above, Plaintiff complained of digestive

13

issues to numerous physicians on numerous occasions following her back surgery:

- In April 2010, Dr. Babbo referred Plaintiff to a GI specialist after she complained of digestive issues and abdominal tenderness.  (Tr. 331.)

- In May 2011, Plaintiff complained of frequent diarrhea to Dr. Petrulis, reporting that she had not had a solid bowel movement since her back surgery.  (Tr. 472.)  Dr. Petrulis diagnosed ulcerative colitis.  (Tr. 474.)

- In June 2011, Plaintiff treated with GI specialist Dr. Soloman.  (Tr. 454.)  Plaintiff reported 6 to 10 watery bowel movements per day since her spinal fusion surgery.  (*Id.*)  Dr. Soloman's diagnosis included ulcerative colitis; bloating; abdominal cramping; and loose stools.  (Tr. 456.)

- In August 2011, Plaintiff treated with GI specialist Dr. Hasan. (Tr. 436-440.)  Dr. Hasan was not convinced that Plaintiff presented with ulcerative colitis, noting that Plaintiff's symptoms might be related to IBS or her prior surgery.  (Tr. 440.)

- At an appointment with pain management specialist Dr. Ryan, in November 2011, Dr. Ryan's encounter diagnosis included ulcerative colitis.  (Tr. 421.)

- In January 2012, Plaintiff followed up with Dr. Hasan about her complaints of persistent diarrhea.  (Tr. 558.)  Plaintiff reported little improvement with fiber and medications.  (*Id.*)  Dr. Hasan noted that Plaintiff's symptoms were most consistent with IBS and GERD but that he could not exclude the possibility of microscopic colitis or malabsorption.  (Tr. 562.)

Thus, Plaintiff had been diagnosed with ulcerative colitis by more than one physician, and she complained of chronic diarrhea on more than one occasion.  While Dr. Hasan has opined that Plaintiff's persistent diarrhea may be caused by a condition other than ulcerative colitis, there is nonetheless a great deal of evidence in the record indicating that Plaintiff suffered from some condition that caused her to experience frequent episodes of diarrhea.  As the ALJ discussed none of this evidence in his hearing decision, the Court is unable to determine whether the ALJ at least considered the evidence in determining Plaintiff's RFC.  Clearly, the ALJ did not evaluate it.

14

Furthermore, while much of the evidence relating to Plaintiff's digestive issues comes from her subjective complaints to her physicians as well as her hearing testimony, the ALJ fails to identify whether he relied on this evidence in any way in determining Plaintiff's RFC.   If the ALJ rejected Plaintiff's reports of needing multiple bathroom breaks per day, he did not indicate why he found her subjective complaints less than fully credible. Had the ALJ's analysis of the medical evidence revealed that Plaintiff's diarrhea did not affect her ability to work or did not require additional limitations beyond those outlined in her RFC, the ALJ should have explained his reasons for drawing that conclusion.  Instead, the ALJ ignored all evidence relating to Plaintiff's chronic diarrhea, despite the fact that her complaints were addressed on numerous occasions by numerous physicians, including Drs. Babbo, Petrulis, Soloman, Ryan, and Hasan.

Additionally, as Plaintiff notes in her Brief, the ALJ's failure to consider her ulcerative colitis/diarrhea makes this Court's review of the ALJ's decision particularly difficult, because the VE testified about the impact that 8 to 10 bathrooms breaks per day would have on Plaintiff's ability to perform jobs available in significant numbers in the national economy.  Plaintiff's attorney asked the VE whether Plaintiff, who would require 8 to 10 bathroom breaks per day, would be capable of performing any jobs.  (Tr. 90.)  The VE stated: "Well that could require a special accommodation.  It's difficult to say.  In an office setting, it's possible she could get away with it if she were close to the restroom, but as jobs are ordinarily performed they don't permit that many restroom breaks." (*Id.*)  The VE further stated that it would be difficult to place a person with such a limitation in a job.[3]

---

[3]      Plaintiff interprets the VE's testimony to mean that because Plaintiff would require 8 to 10 bathroom breaks per day, she would be off-task at least 20 percent of the

(*Id.*)  In relying on the VE's testimony to find that Plaintiff could perform jobs that exist in significant numbers in the national economy, the ALJ wholly ignores the VE's testimony regarding special accommodations for employees who require excessive bathroom breaks.  Thus, the Court is unable to assess whether the ALJ even considered the VE's testimony on this issue.  In determining that Plaintiff could perform a significant number of jobs, the ALJ should have acknowledged the VE's testimony regarding bathroom breaks, and explained why Plaintiff could sustain full-time work even if she required 8 to 10 bathroom breaks per day.

The ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p. Here, while the ALJ's failure to find Plaintiff's ulcerative colitis/diarrhea to be a severe impairment at step two was, at most, harmless, the ALJ did err in failing to consider evidence of this condition when determining Plaintiff's RFC.  Given the numerous medical records from several physicians that document Plaintiff's complaints of chronic diarrhea, the ALJ should have at least considered Plaintiff's ulcerative colitis/diarrhea in determining her RFC.  For the foregoing reasons, Plaintiff's first and second assignments of error present a basis for remand of her case.

-------------------

workday, and therefore would be unemployable.  When Plaintiff's attorney questioned the VE about the need for excessive bathroom breaks throughout the day, however, he did not state a specific duration for each bathroom break, nor did he clarify whether all 8 to 10 bathroom breaks per day would take place during an eight-hour workday.  Thus, it is unreasonable to assume that the need to take 8 to 10 bathroom breaks per day equates to being off task 20 percent of the workday.  The VE did, however, testify that taking 8 to 10 bathroom breaks in a workday would require a special accommodation by the employer, and the ALJ should have addressed that testimony in his hearing decision.

### 3. The ALJ Erred in Evaluating the Opinion of Plaintiff's Treating Physician, Dr. Petrulis.

Plaintiff argues that the ALJ erred in evaluating Dr. Petrulis' October 2011 opinion regarding Plaintiff's physical condition.  (Tr. 543-544.)  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted). Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Here, in addressing Dr. Petrulis' opinion, the ALJ wrote:

> [Plaintiff] has a normal gait, normal muscle strength, normal

> reflexes, and normal ranges of motion in the elbows, wrists, and
> fingers (Ex. 4F and Ex. 8F page 5).  She has normal abilities for
> fine and gross manipulations, including picking up a coin, using
> a key, writing, holding a cup, opening a jar, opening a door, and
> using buttons (Ex. 4F).  Due to these normal findings, the
> undersigned rejects the opinions expressed at exhibit 7F.

(Tr. 42.)  The ALJ did not mention Dr. Petrulis by name, but it is clear that he rejected her

October 2011 RFC opinion.  In rejecting Dr. Petrulis' opinion, the ALJ relied solely on two

"normal" physical examinations, without explaining how those examinations contradicted

or undermined Dr. Petrulis' findings.  In supporting her RFC opinion, Dr. Petrulis wrote that

Plaintiff was unable to change positions without discomfort; was severely impaired in her

ability to hold heavy objects; had severe pain all of the time; and had to rely on her children

to assist with her activities of daily living.  (Tr. 544.)  The ALJ offered no explanation for

why two examinations showing normal gait, muscle strength, reflexes, abilities for fine and

gross manipulations, and ranges of motion in the elbows, wrists, and fingers caused him

to reject Dr. Petrulis' opinion in its entirely.

The ALJ fails to identify the sufficient record evidence contradicting or undermining

the opinion of Dr. Petrulis or describe how her opinion lacks support in, or is inconsistent

with, the record as a whole.  See, e.g., *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543,

552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion

as incompatible with other evidence of record; there must be some effort to identify the

specific discrepancies and to explain why it is the treating physician's conclusion that gets

the short end of the stick.").  Further, this is not a case in which the ALJ's discussion of

other medical opinions in the record provides a clear basis for rejecting the treating

physician's opinion.  See, e.g., *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71

18

(6th Cir. 2006) (finding that the ALJ's discussion of other medical evidence and opinions made it clear that the opinions of the claimant's treating physicians were inconsistent with the record evidence as a whole and, thus, "implicitly provided" sufficient reasons for rejecting their opinions). Rather, the ALJ's discussion of other medical opinions in the record is similarly brief and conclusory. Accordingly, the ALJ's unsatisfactory explanation for rejecting the opinion of Dr. Petrulis frustrates the dual purposes of the "good reason" requirement: It neither sufficiently describes to Plaintiff the basis for the ALJ's conclusions, nor provides this Court with adequate material for meaningful review. Accordingly, Plaintiff's third assignment of error presents a basis for remand of her case.

### 4. The ALJ Erred in Failing to Acknowledge a Third Party Statement from Plaintiff's Former Supervisor.

Plaintiff argues that the ALJ erred in failing to consider a letter from Sammy Gutierrez, Plaintiff's former supervisor. (Tr. 324.) In her letter, Ms. Gutierrez noted that Plaintiff required "an extensive amount of time off" after her surgery, and that "many accommodations needed to be made for [Plaintiff] in the work place." (*Id.*) She further noted that Plaintiff needed to take frequent breaks throughout the day due to her pain, and that she was unable to complete many aspects of her jobs. (*Id.*) Plaintiff argues that the ALJ erred in failing to acknowledge Ms. Gutierrez's letter in determining Plaintiff's RFC.

The Social Security Rulings provides that, in determining the credibility of a claimant's statements, the ALJ must consider the entire case record, including statements from non-medical sources like spouses, friends, and neighbors. *See* S.S.R. 96-7p, 1996 WL 374186, at *1 (S.S.A.); *see* S.S.R. 06-03p, 2006 WL 2329939, at *1 (S.S.A.). Although information from "other sources" cannot determine the existence of a medically

19

determinable impairment, it can provide insight into the severity of the impairment and how it affects the individual's ability to function.  S.S.R. 06-3p, 2006 WL 2329939, at *2.

Here, the ALJ stated that he made his RFC determination "[a]fter careful consideration of the entire record," but he did not address Ms. Gutierrez's letter directly. Plaintiff contends that S.S.R. 96-7p required the ALJ to address the third-party report directly and explain his reasons for the weight he gave it.  This reading of the Social Security Regulations is wholly unsupported:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally *should* explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

S.S.R. 06-03p, 2006 WL 2329939, at *6 (emphasis added).  An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party; and an ALJ is not required to make explicit credibility findings as to each bit of conflicting testimony so long as his factual findings as a whole show that he implicitly resolved such conflicts.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)).  Accordingly, Plaintiff's contention that the ALJ violated the Social Security Rulings by failing to discuss and explain the weight he gave to Ms. Gutierrez's letter lacks merit.

Furthermore, even if the ALJ erred in failing to consider Ms. Gutierrez's opinion, that error would be, at most, harmless.  As the Commissioner notes, Ms. Gutierrez stated

20

that Plaintiff was no longer able to fulfill her job duties as a group home supervisor.  (Tr. 324.)  The ALJ essentially agreed with this, as he found that Plaintiff's impairments and resulting limitations would preclude her from returning to her past relevant work as a group home supervisor.  (Tr. 43.)  Therefore, even if the ALJ credited Ms. Gutierrez's statements, it would not change the outcome of Plaintiff's case.  Accordingly, Plaintiff's fourth assignment of error has no merit.

## VI.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this Report and Recommendation.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: January 29, 2015

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

21